IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **JOSHUA HOSKINS,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| vs. | ) Case No. 3:21-CV-683-MAB |
| | ) |
| **MICHAEL BARTOLOTTI, et al.,** | ) |
| | ) |
| **Defendants.** | ) |

### MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

This matter is currently before the Court on the motion for partial summary judgment on the issue of exhaustion filed by Defendants Chad Adams, Michael Bailey, Michael Bartolotti, Mark Bell, Eric Blaylock, Dustin Bowles, David Brock, Shawn Brown, Garrick Hale, Charles Heck, Kale Lively, Matthew Newbury, Nicholas Pestka, Jesse Reid, Alexander Rodman, Corey Vaughn (Docs. 54, 55; *see also* Docs. 56–61).

#### BACKGROUND

Plaintiff Joshua Hoskins filed this lawsuit on June 22, 2021 pursuant to 42 U.S.C. § 1983 alleging his constitutional rights were violated while he was incarcerated at Pinckneyville Correctional Center ("Pinckneyville") (Doc. 1).[1] Plaintiff alleged that during his last three-and-a-half months at Pinckneyville—between December 31, 2020 and April 18, 2021—almost four dozen correctional officers and one nurse violated his

---

[1] Plaintiff was released on parole in October 2023 (*see* Doc. 67, Doc. 69).

rights by interfering with his ability to renew or receive his prescription psychotropic medications (Doc. 1; Doc. 19). More specifically, Plaintiff alleged that the officers and the nurse limited his interactions with mental health staff (Doc. 1, p. 63), forced him to tell the psychiatrist he was fine and did not need his medications to be renewed (*id.*), intercepted and destroyed the sick call slips that he submitted regarding his medications (*id.* at pp. 63, 65), destroyed some of his grievances or otherwise interfered with his access to the grievance process (*id.* at pp. 63, 65), and made him sign treatment refusal forms (p. 64). He alleged that Defendants threatened him with false disciplinary reports, segregation time, and beatings if he asked for his medications to be renewed, reported his mental health symptoms, or reported their misconduct (*Id.* at pp. 63, 64). And he alleged that Defendants monitored his mental health records and appointments to make sure that he was refusing his medications (*Id.* at p. 64).

According to Plaintiff, there were multiple reasons for Defendants' conduct, including to retaliate for his "extensive grievance and litigation history against their facility staff," to sabotage his existing lawsuits and any future lawsuits he might file, to keep him from reporting their misconduct, to keep themselves and their friends out of trouble, and because they wanted "to see me affected mentally and physically" (Doc. 1, pp. 63, 64, 65).

Following a threshold review of the complaint pursuant to 28 U.S.C. § 1915A, Plaintiff was permitted to proceed on the following claims against 16 of the 45 individuals that he named:

> **Claim 1:** Eighth Amendment deliberate indifference claim for interfering with Plaintiff's access to psychotropic medications;
>
> **Claim 2**: Fourteenth Amendment due process claim for interfering with Plaintiff's access to psychotropic medications;[2] and
>
> **Claim 3**: First Amendment retaliation claim for "agreeing to hinder [Plaintiff's] grievances to prevent [him] from getting his medications."

(Doc. 19, p. 6; *see also id.* at pp. 8–9).[3]

The sixteen Defendants filed a motion for partial summary judgment on the issue of exhaustion on March 1, 2023 (Doc. 54; Doc. 55; *see also* Docs. 56–61). They argue that Plaintiff did not exhaust his administrative remedies as to Counts 1 and 2 regarding Defendants Bell, Bowles, Brown, Heck, Lively, Newbury, Reid, Rodman, and Vaughn and did not exhaust Count 3 as to all Defendants (Doc. 54). Plaintiff filed his response in opposition five days later (Doc. 64). Defendants did not file a reply brief.

## LEGAL STANDARDS

Summary judgment is proper only if the movant shows that there is no genuine issue as to any material fact and they are entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). In making that determination, the court must view the evidence in the light

---

[2] The Court explained that Plaintiff's allegations that prison employees prevented him from accessing medication could potentially constitute deliberate indifference to a medical need in violation of the Eighth Amendment or a violation of Plaintiff's liberty interests under the Fourteenth Amendment (or perhaps neither) (Doc. 19, p. 8). Given the early stage of the case, the Court allowed Plaintiff to proceed on both an Eighth Amendment claim and a Fourteenth Amendment claim, despite the overlap between the two (*Id.*).

[3] The threshold order also mentioned that this case is strikingly similar to a previous case: *Hoskins v. Swisher*, 20-cv-395-MAB (S.D. Ill 2020) (Doc. 10, p. 7 n.2). In the previous case, Plaintiff alleged that during an earlier time period—from his arrival at Pinckneyville in June 2019 to April 2020—over two dozen correctional officers and medical providers at Pinckneyville conspired to deny him access to his psychiatric medications. *See* SDIL Case No. 20-cv-395-MAB, Docs. 16, 115, 210. Summary judgment was granted to Defendants after the Court determined that Plaintiff's story was so utterly implausible that no rational jury could possibly side with him. *Id.*, Doc. 210.

most favorable to, and draw all reasonable inferences in favor of, the nonmoving party. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013) (citation omitted).

The Prison Litigation Reform Act provides that a prisoner may not bring a lawsuit about prison conditions unless and until he has exhausted all available administrative remedies. 42 U.S.C. § 1997e(a); *Pavey v. Conley*, 663 F.3d 899, 903 (7th Cir. 2011). Exhaustion is an affirmative defense, which the defendants bear the burden of proving. *Pavey*, 663 F.3d at 903 (citations omitted). In order for a prisoner to properly exhaust his or her administrative remedies, the prisoner must "file complaints and appeals in the place, and at the time, the prison's administrative rules require." *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002); *see also Woodford v. Ngo*, 548 U.S. 81, 90 (2006). Failure to do so means failure to exhaust. *Riccardo v. Rausch*, 375 F.3d 521, 524 (7th Cir. 2004). However, an inmate is required to exhaust only those administrative remedies that are available to him. *Pyles v. Nwaobasi*, 829 F.3d 860, 864 (7th Cir. 2016); *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006). Administrative remedies become "unavailable" when, for example, prison officials fail to respond to a properly filed inmate grievance or when prison employees thwart a prisoner from exhausting. *Pyles*, 829 F.3d at 864; *Lewis v. Washington,* 300 F.3d 829, 833 (7th Cir. 2002); *Dole*, 438 F.3d at 809**.**

As an inmate in the IDOC, Plaintiff was required to follow the three-step grievance process outlined in the Illinois Administrative Code to exhaust his claims. 20 ILL. ADMIN. CODE § 504.800, *et seq.* (2017). The regulations require an inmate to first submit

the grievance to their counselor. *Id.* at § 504.810(a).[4] Then the grievance goes to the grievance officer, who tenders a report and recommendation to the warden, who then issues a final decision. *Id.* at § 504.830(e). If unsatisfied with the warden's decision, the inmate can appeal to the to the Administrative Review Board for a final determination by the Director of the IDOC. *Id.* at §§ 504.850(a), (d), (e).

An inmate may also request that a grievance be handled as an emergency by submitting the grievance directly to the warden. 20 ILL. ADMIN. CODE § 504.840. If the warden finds that an emergency exists, then the grievance will be handled on an expedited basis. *Id.* On the other hand, if the warden determines that the grievance should not be handled on an emergency basis, the inmate is notified and must resubmit the grievance through the standard grievance process." *Id.*

## DISCUSSION

As mentioned in Plaintiff's previous case, and demonstrated by the records in this case, Plaintiff was a prolific grievance writer. *See* SDIL Case No. 20-cv-395-MAB, Doc. 115, pp. 5–6. Defendants submitted approximately 500 pages of grievance records (Docs. 56–61). It is undisputed that Plaintiff fully exhausted numerous grievances complaining about the issues and events pertinent to this lawsuit (*see* Doc. 55, pp. 2–6). However, Defendants argue these grievances are insufficient to exhaust as to Defendants Bell, Bowles, Brown, Heck, Lively, Newbury, Reid, Rodman, and Vaughn with respect to Counts 1 and 2 because none of the grievances named these Defendants or referenced

---

[4] There are exceptions to this rule, none of which apply here. 20 ILL. ADMIN. CODE §§ 504.810, 504.830 (2017).

any actions taken by them (Doc. 55, p. 9). Defendants also argue these grievances are insufficient to exhaust as to any of them with respect to Count 3 because none of the grievances contain any complaints that they purposefully restricted Plaintiff's access to the grievance procedure during the applicable period (*Id.*).

A. **PLAINTIFF'S FULLY EXHAUSTED GRIEVANCES**

Defendants admitted there were five relevant grievances that were fully exhausted (Doc. 55, pp. 2–6, 10–11). They pointed to a sixth grievance, which they claim was not fully exhausted because it was rejected at every level for failing to include an incident date (Doc. 55, pp. 4–5; 11). However, for the reasons explained below, the Court finds this grievance was improperly rejected and is therefore deemed fully exhausted. Plaintiff then put forth two additional grievances that were fully exhausted before he filed suit (Doc. 64, pp. 11–15, 15–19). Defendants did not file a reply brief or otherwise address the arguments and additional facts asserted by Plaintiff or the evidence he submitted in support thereof.

All eight grievances are discussed below in chronological order, with only the essential facts recounted.

1. **Grievance 40-1-21, dated January 3, 2021** (Doc. 64, pp. 15–19; *see also* Doc. 58, pp. 69–73)

This grievance was submitted by Plaintiff. The ARB addressed the merits of the grievance after determining that it was improperly rejected at the facility level. In this grievance, Plaintiff complained that Defendant Blaylock said he and other officers "had it out for [Plaintiff]." (Doc. 58, p. 72). Blaylock said (1) that he would monitor Plaintiff's

conversations with mental health "to make sure he knew what to do if [Plaintiff] reported security staff conduct of mistreating [him]," (2) that he told staff in the health care unit to destroy Plaintiff's sick call slips, and (3) that Defendants Bowles and Rodman were working with other officers to have Plaintiff transferred "due to [Plaintiff's] litigation history and grievance history." Plaintiff further stated that he filed previous grievances against a laundry list of staff, including Defendants Adams Bailey, Bartolotti, Bell, Brock, Brown, Hale, Reid, and Rodman, for "interfering with [him] getting mental health care and necessities (medications) through the nurses and telepsychiatrists," but he never received receipts for the grievances or responses.

> **2. Grievance #116-01-21, dated January 8, 2021** (Doc. 58, pp. 38–42; *see* Doc. 55, pp. 3–4)

In this grievance, Plaintiff complained that on January 7, 2021, Defendant Bartolotti told Plaintiff that officers wrote a bogus kite to frame Plaintiff and then issued him a false disciplinary ticket (Doc. 58, pp. 41–42). The following day, Defendant Blaylock reiterated to Plaintiff that officers were working in coordination to mess with him. Blaylock said Defendants Bowles and Rodman were working with other non-defendants to get Plaintiff transferred and that Defendant Bailey planned to destroy Plaintiff's legal work during the transfer. Blaylock also said Plaintiff would never be allowed to receive psychotropic medications and that he better tell the mental health staff that he does not need his medications and has no crisis issues. Blaylock told Plaintiff the officers' actions were "out of retaliation" because "they were tired of me filing grievances and lawsuits."

    **3. Grievance 158-01-21, dated January 8, 2021** (Doc. 64, pp. 11–14; *see also* Doc. 57, pp. 124–25; Doc. 58, pp. 1–6)

This grievance was submitted by Plaintiff. The ARB addressed the merits of the grievance after determining that it was improperly rejected at the facility level. In this grievance, Plaintiff complained about various actions of a non-Defendant officer, including the officer ordering Plaintiff not to say that he needed psychotropic medications, to refuse any that were prescribed, and not to report his mental health symptoms (Doc. 58, pp. 1–2). Plaintiff also complained that he had written grievances "over and over" in 2020 about numerous employees at the prison and their various forms of misconduct, but he never received receipts for the grievances or any responses. He specifically mentioned that between May and December 2020, he submitted grievances complaining about employees, including Defendants Bell, Heck, Lively, Rodman, "interfering with [him] seeing the telepsychiatrist to get medications and for other reasons." He said he put them in the "R1, R2, R3, R4, R5, R6 grievance boxes," but he never received receipts for the grievances or any responses.

    **4. Grievance #160-01-21 dated January 11, 2021** (Doc. 58, pp. 55–58; *see also* Doc. 55, pp. 4–5).

Defendants submitted this grievance but argue that it was not exhausted because it was rejected at every stage of the process for failing to cite a date for the incident complained about in the grievance (Doc. 55, pp. 11–12). However, the first line of the grievance very clearly states, "On the above date," meaning the date written at the top of the grievance: January 11, 2021 (Doc. 58, p. 57). On another occasion, the ARB told the facility that it was wrong for rejecting a grievance for failing to provide a date when the

first line of the grievance said "on the above date . . ." (Doc. 58, p. 3). Other grievances that used the same "on the above date" language were accepted and not rejected for failing to provide a date of the incident (*see, e.g.,* Doc. 58, p. 41; *see also id.* at pp. 38–40, 42). Accordingly, the Court finds that this grievance was improperly rejected thus rendering the grievance process unavailable.

In this grievance, Plaintiff said he complained to Defendant Adams that officers on the evening shift were ignoring his requests for crisis staff assistance and psychotropic mediation, but Adams disregarded his complaint (Doc. 58, pp. 57–58). Adams also said he "let" Sgt. Belford write false tickets to Plaintiff. And Adams told Plaintiff he had better not tell the psychiatrist that he needs his medications renewed and "gave . . . retaliatory reasons as to why he gave his conduct." Later, a different officer told Plaintiff that Defendants Bowles, Rodman, Reid, and Brown were working with some other officers to get Plaintiff transferred "for filing all these litigations and grievances," and to make the transfer look like it was legitimate and not retaliatory.

**5. Grievance #279-01-21, dated January 21, 2021** (Doc. 57, pp. 107–11; *see* Doc. 55, pp. 2–3)

This grievance is primarily about the conduct of three non-Defendants on January 20, 2021 (*see* Doc. 57, pp. 110–11). However, at the very end of the grievance, Plaintiff stated that during the month of January 2021, other staff members, including Defendants Blaylock and Pestka and various non-Defendants "gave the same conduct," meaning they told him that he better tell the psychiatrist that he did not need his medications renewed, that they would be checking his medical records to made sure he complied, and that they

would write false disciplinary tickets against him if they found out his medications had been renewed (Doc. 57, p. 111). Plaintiff also wrote that they "gave retaliatory reasons as to why they gave their conduct" (*Id.*).

    **6. Grievance #292-01-21, dated January 24, 2021** (Doc. 58, pp. 43–47; *see* Doc. 55, p. 4)

In this grievance, Plaintiff claims that on January 24th, Defendant Blaylock said he received information about Plaintiff's mental health visits from staff in the health care unit (Doc. 58, pp. 46–47). Blaylock told Plaintiff that any time he saw the telepsychiatrist, he better refuse his psychotropic medications, or he would be beaten. Blaylock also told him that Defendants Rodman and Bowles (and other non-Defendants from the Internal Affairs and Intelligence units) had already said they would coverup evidence of any beating and deny any grievance about a beating, and that medical staff had been told not to document any injuries from a staff beating. Plaintiff went on to say that on January 17 and 24, Defendant Bartolotti said the same things as Blaylock. In a note at the end of the grievance, Plaintiff stated that Defendants Bailey, Hale, Pestka, Blaylock, Bartolotti, Adams, and various non-Defendants "gave the same conduct . . . [of] not allowing me to get psyc [sic] meds renewed," but he did not provide the dates of these interactions. Plaintiff stated that he had more "details and dates" for Blaylock's conduct and "more staff involved," but he could not provide them "due to how [he was] feeling mentally & physically."

    **7. Grievance is #345-01-21, dated January 27, 2021** (Doc. 58, pp. 63–66; *see also* Doc. 55, p. 5).

In this grievance, Plaintiff alleges that on multiple occasions in January 2021,

Defendant Brock told Plaintiff he had better tell the psychiatrist that he did not need his psychotropic medications renewed (Doc. 58, pp. 65–66). If Plaintiff did not comply, Brock would fabricate a disciplinary ticket and have Plaintiff sent to segregation. Plaintiff went on to say that Brock "gave retaliatory reasons as to why [he] gave [his] conduct." In a note at the end of the grievance, Plaintiff stated that Defendant Bartolotti and Bailey "gave the same conduct" as Brock on January 25th and 27th, respectively, as well as a number of other non-Defendants (*Id.*).

8. **Emergency grievance #474-02-21, dated February 16, 2021** (Doc. 58, pp. 82–86; *see also* Doc. 55, pp. 5–6).

This grievance is primarily about a non-Defendant: Nurse Patterson, interfering with the administration of Plaintiff's blood pressure medication, having his sick call slips about a dental issue and his blood pressure medication torn up, and demanding that he tell the tele-psychiatrist that he did not need his psychotropic medications renewed. Nurse Patterson threatened that if Plaintiff did not comply, she would make false accusations about him. Plaintiff said that Nurse Patterson "gave retaliatory reasons as to why she gave her conduct." Plaintiff then alleged that Defendants Adams, Bailey, Bartolotti, Blaylock, Brock, and Pestka, and various other non-Defendants "are involved in the same conduct during the encounters that I had with them as mentioned in previous grievances," but did not specify what that conduct was. Plaintiff said he was "dealing with memory difficulties" and didn't have his notes, so he was not able to list the names of all the staff members involved or the dates of their conduct.

The grievance officer's response stated, in part, that Plaintiff "continues to write grievances in reference to the same correctional staff and nurses indicating that they are all advising him to not take his meds. All correctional staff . . . and nursing staff continue to deny all the allegations that are brought against them in each grievance. It is noted from mental health that grievant has a history of refusing his medication and believes that security staff is out to get him." (Doc. 58, p. 84).

**B.  EXHAUSTION AS TO COUNTS 1 AND 2 FOR INTERFERING WITH PLAINTIFF'S MEDICATIONS**

Defendants implicitly concede that Plaintiff exhausted as to Adams, Bailey, Bartolotti, Blaylock, Brock, Hale, and Pestka as to Counts 1 and 2, but argue that Plaintiff failed to exhaust as to Defendants Bell, Bowles, Brown, Heck, Lively, Newbury, Reid, Rodman, and Vaughn because none of the fully exhausted grievances named these Defendants or referenced any actions taken by them (Doc. 55). This is the same type of argument the defendants made in Plaintiff's previous case and was rejected by the Court. *See* SDIL Case No. 20-395, Doc. 115, pp. 8–10. Specifically, in the previous case, the Court concluded that Plaintiff's claims about numerous correctional officers coercing or forcing him to refuse his psychotropic medications on an ongoing basis between June 2019 and April 2020 involved a continuing violation. *Id.* Therefore, he only had to grieve the issue once and did not have to file a new grievance each time a new officer became involved in the alleged ongoing campaign to force him to refuse his medications. *Id.* There were at least eight fully exhausted grievances, which sufficed to alert prison officials to the problem, and exhausted as to all Defendants whether or not they were explicitly named in the grievances. *Id.*

In making the motion for summary judgment in the instant case, Defendants did not acknowledge the Court's previous ruling and thus did not offer an any explanation why Plaintiff's claims in the instant case (which are substantially similar to the claims in his previous case), should not be viewed as a continuing violation (*see* Doc. 55). They simply recycled the same arguments the Court previously rejected (*i.e.*, Plaintiff failed to exhaust because he did not name them or otherwise refer to them in his fully exhausted grievances) (Doc. 55). The Court again concludes that Plaintiff's claims that numerous correctional officers coerced or forced him to refuse his psychotropic medications on an ongoing basis between December 31, 2020 and April 18, 2021, involve a continuing violation.

When a case involves a continuing violation, the prisoner "need not file multiple, successive grievances raising the same issue" because "once a prison has received notice of, and an opportunity to correct, a problem, the prisoner has satisfied the purpose of the exhaustion requirement." *Turley v.* Rednour, 729 F.3d 645, 650 (7th Cir. 2013). The prisoner is not required to file an additional grievance for every subsequent act that contributes to the continuation of the same problem.[5] Separate grievances are only

---

[5] *See Johnson v. Johnson,* 385 F.3d 503, 521 (5th Cir. 2004) ("It would make little sense to require a prisoner being subjected to a frigid cell to continue to file grievances stating that the cell remains frigid[.]"). *See also Wilcox v. Brown*, 877 F.3d 161, 167 n.4 (4th Cir. 2017) (holding that prisoner was not required to file an additional grievance challenging new chaplain's refusal to resume Rastafarian services when he had already submitted and fully exhausted a previous grievance objecting to the discontinuation of services); *Parzyck v. Prison Health Servs., Inc.*, 627 F.3d 1215, 1219 (11th Cir. 2010) (holding prisoner was "not required to initiate another round of the administrative grievance process on the exact same issue each time another request for an orthopedic consultation was denied [by a new doctor]."); *Johnson v. Killian*, 680 F.3d 234, 239 (2d Cir. 2012) (holding that prisoner was not required file additional grievance challenging new warden's renewed enforcement of same policy that prisoner complained about in an earlier grievance against the previous warden).

required if the underlying facts or the complaints about particular incidents are different. *Turley*, 729 F.3d at 650.[6]

While this lawsuit pertains to the three-and-a-half-month span between December 31, 2020, and April 18, 2021, Plaintiff had actually been complaining since he arrived at Pinckneyville in June 2019 about correctional officers and medical providers conspiring to coerce or force him to refuse his psychotropic medications in retaliation for filing grievances and lawsuits. *See* SDIL Case No. 20-cv-395, Doc. 115, pp. 1–2, 8–10; *see also id.* at Doc. 210, pp. 3–4 (recounting that Plaintiff was transferred to Pinckneyville on June 5, 2019). Prison officials were either aware or should have been aware that Plaintiff was not complaining about an isolated or discrete incident attributable to a single officer, or even a limited number of officers. Rather, Plaintiff was complaining about an ongoing issue with a host of correctional officers and medical providers using various tactics to

---

[6] *See Henderson v. Jess*, No. 21-1585, 2022 WL 1831133, at *3 (7th Cir. June 3, 2022) ("[F]or the continuous-violation doctrine to apply, the grievances on file must afford the prison notice of the precise claim at issue in the later lawsuit."); *White v. Velie*, 709 F. App'x 35, 36 (2d Cir. 2017) ("[A]n earlier grievance may be 'sufficient to exhaust [a prisoner's] administrative remedies with respect to the continuing' infringement of his rights" when the "prior grievance identifies a *specific* and *continuing* complaint that ultimately becomes the basis for a lawsuit.") (quoting *Johnson v. Killian*, 680 F.3d 234, 239 (2d Cir. 2012)) (alterations and emphasis in original); *Johnson*, 385 F.3d at 521, n.13 ("We pause to observe that we do not here hold that a grievance filed in response to one particular incident automatically exhausts claims that arise from future incidents of the same general type."). *See also Henderson,* 2022 WL 1831133, at *4 (where prisoner alleged he was denied proper Ramadan meals for five years, his grievances about the two years in which he was taken off the Ramadan meal schedule altogether did not also exhaust his claims about the three years in which he had issues with particular Ramadan meals (for example, missing items and low-calorie counts)); *Siggers v. Campbell*, 652 F.3d 681, 693 (6th Cir. 2011) (rejecting prisoner's claim of a continuous violation and holding that one grievance was not sufficient to exhaust every instance in which his incoming and outgoing mail was improperly rejected over 18 months because each instance involved "separate facts and circumstances—and even different policy directives"); *Moore v. Bennette*, 517 F.3d 717, 728–29 (4th Cir. 2008) (where prisoner alleged a pattern of inadequate medical care for various medical conditions, his grievances about his pancreatic condition and hepatitis C did not also exhaust his claims about his gout) (*cited by Turley*, 729 F.3d at 650).

continuously obstruct his access to his medications.

According to Plaintiff, the tactics officers used included: (1) telling Plaintiff not to ask for medication refills or to refuse refills (2) threatening Plaintiff with false accusations and false disciplinary tickets if he got his medications renewed, (3) threatening to beat Plaintiff if he got his medications renewed, (4) limiting his interactions with mental health staff, (5) intercepting and destroying his sick call slips, (6) intercepting and destroying his grievances, (7) making him sign treatment refusal forms, and (8) monitoring his medical records and appointments. As the Court sees it, Plaintiff should have specifically complained about each of these tactics in a fully exhausted grievance because each tactic was a separate, even if related, issue. Moreover, Plaintiff needed to give prison officials notice and a fair opportunity to address each problem that eventually formed the basis of the lawsuit.[7]

---

[7] *See Henderson v. Jess*, No. 21-1585, 2022 WL 1831133, at *3 (7th Cir. June 3, 2022) ("[F]or the continuous-violation doctrine to apply, the grievances on file must afford the prison notice of the precise claim at issue in the later lawsuit."); *White v. Velie*, 709 F. App'x 35, 36 (2d Cir. 2017) ("[A]n earlier grievance may be 'sufficient to exhaust [a prisoner's] administrative remedies with respect to the continuing' infringement of his rights" when the "prior grievance identifies a *specific* and *continuing* complaint that ultimately becomes the basis for a lawsuit.") (quoting *Johnson v. Killian*, 680 F.3d 234, 239 (2d Cir. 2012)) (alterations and emphasis in original); *Johnson*, 385 F.3d at 521, n.13 ("We pause to observe that we do not here hold that a grievance filed in response to one particular incident automatically exhausts claims that arise from future incidents of the same general type."). *See also Henderson,* 2022 WL 1831133, at *4 (where prisoner alleged he was denied proper Ramadan meals for five years, his grievances about the two years in which he was taken off the Ramadan meal schedule altogether did not also exhaust his claims about the three years in which he had issues with particular Ramadan meals (for example, missing items and low-calorie counts)); *Siggers v. Campbell*, 652 F.3d 681, 693 (6th Cir. 2011) (rejecting prisoner's claim of a continuous violation and holding that one grievance was not sufficient to exhaust every instance in which his incoming and outgoing mail was improperly rejected over 18 months because each instance involved "separate facts and circumstances—and even different policy directives"); *Moore v. Bennette*, 517 F.3d 717, 728–29 (4th Cir. 2008) (where prisoner alleged a pattern of inadequate medical care for various medical conditions, his grievances about his pancreatic condition and hepatitis C did not also exhaust his claims about his gout) (cited by *Turley*, 729 F.3d at 650).

Because Defendants did not address the continuing violation doctrine or its limits (*see* Doc. 55), the application of the affirmative defense of exhaustion remains uncertain. In other words, Defendants did not make the arguments necessary to carry their burden of proving that Plaintiff failed to exhaust his administrative remedies as to Counts 1 and 2, and this aspect of their motion for summary judgment is denied.

C.  **EXHAUSTION AS TO COUNT 3 FOR RETALIATION**

Defendants argue that Plaintiff failed to exhaust as to Count 3 because all of the relevant grievances "failed to allege any Defendant purpose[fully] restricted Plaintiff's access to the grievance procedure during the applicable period." (Doc. 55, p. 9).

As an initial matter, the nature of Claim 3 must be clarified. In the threshold Order, the Court designated Claim 3 as a First Amendment retaliation claim against all Defendants for "agreeing to hinder [Plaintiff's] grievances to prevent [him] from getting his medications." (Doc. 19, pp. 6–7). This is the language Defendants understandably relied on in moving for summary judgment (*see* Doc. 55, pp. 1, 9). However, after re-reviewing the threshold Order in its entirety and the complaint, the Court believes the Claim 3 is actually more expansive. For example, in the latter part of the threshold Order where Claim 3 is discussed, the Court wrote that Plaintiff alleged "he had pending lawsuits and grievances [and] that in response to these lawsuits and grievances the defendants have prevented him from getting the psychotropic medications that he needed." (Doc. 19, p. 9). The Court also wrote that Plaintiff alleged "[D]efendants formulated [their] *entire course of conduct* to stop him from filing future lawsuits or grievances, and/or to defeat him in ongoing litigation" (Doc. 19, p. 8) (emphasis added).

The first sentence indicates that the crux of Claim 3 is that Defendants retaliated against Plaintiff by preventing him from getting his prescribed psychotropic medications. And the phrase "entire course of conduct" suggests that the retaliation encompassed *all* of the various actions taken by Defendants to prevent Plaintiff from accessing his medications, not just the destruction of his grievances. That inference is bolstered by the fact that Claim 3 is proceeding against all 16 Defendants, even though Plaintiff did not allege that all 16 Defendants were involved in destroying his grievances (*compare* Doc. 1, pp. 63–65 *with* Doc. 19, pp. 3–5).

Therefore, the central question with respect to exhaustion on Count 3 is whether any of Plaintiff's fully exhausted grievances contain complaints that Defendants were retaliating against him for filing grievances and lawsuits when they took various actions to obstruct him from accessing his prescribed psychotropic medication. The answer to this question is "yes." A number of Plaintiff's fully exhausted grievances mention that officers "gave retaliatory reasons" for their conduct. Therefore, summary judgment as to Count 3 must be denied as to all Defendants.

As a final matter, the Court will address Defendants' specific argument that none of Plaintiff's grievances "allege any Defendant purpose[fully] restricted Plaintiff's access to the grievance procedure during the applicable period" (Doc. 55, p. 9). Plaintiff countered by asserting that he had issues getting some of his grievances processed because Defendants Reid and Brown intercepted and destroyed them, and he "reported their conduct to the ARB a year prior to the filing of this complaint" (Doc. 64, p. 5). Plaintiff also submitted two grievances in which he complained to prison officials that

his properly submitted grievances were going missing (Doc. 64, pp. 14, 19). As such, the Court finds that a disputed issue of fact exists as to whether the grievance process was rendered unavailable to Plaintiff with respect to this particular issue. That is true even though, as Defendants pointed out, Plaintiff's claim that his grievances were being destroyed by staff at Pinckneyville has been addressed in over a dozen cases and no judge has found Plaintiff's claims credible (Doc. 55, p. 13). Defendants did not cite to any authority providing that the undersigned can simply rely on another judge's credibility findings without holding his own evidentiary hearing (*see* Doc. 55).

## CONCLUSION

For the reasons explained above, the motion for partial summary judgment on the issue of exhaustion filed by all Defendants (Doc. 54) is **DENIED.** This ruling renders **MOOT** Plaintiff's related "Motion for the Court to Order Defendants Counsel to Make Witnesses Available if the Court Held a Pavey Hearing" (Doc. 65).

**IT IS SO ORDERED.**

**DATED: March 7, 2024**

s/ Mark A. Beatty
**MARK A. BEATTY**
**United States Magistrate Judge**
